## TULSA STOCKYARDS CO. v. MOORE.

No. 28507. June 21, 1938.

Rehearing Denied Sept. 13, 1938.

Jameson & McMahon and O. C. Essman, for plaintiff in error.

Anton Koch and O. H. Searcy, for defendant in error.

PHELPS, J. The defendant was operating a stockyard. consisting of a large number of pens and compartments into which cattle were separately placed. for the convenience of cattle owners bringing their cattle there for sale, or commission companies who sold cattle for the owners. The plaintiff, a girl of 24 years of age, was gored by a wild and vicious cow in an alleyway of said stockyard, for which she recovered a judgment against the defendant, and the latter appeals.

The plaintiff, in company with her stepfather for whom she worked, had brought some calves to the stockyard on a certain evening. and the calves were placed in a pen near the south end of the main alleyway, which lay north and south just inside the east side of the stockyards. The next morning she went to the stockyard to see about the feeding and watering of the calves which she had left there the evening before. She entered the main alleyway on the north and was proceeding southward on foot. The fences on either side were made of wooden planks or boards, two inches by six inches, and there was a space of several inches between boards. On her right, or the west side of the main alleyway, were many gates. Each of these gates led off into another alleyway, at right angles to the main alleyway, or into pens. When it was desired to

head cattle into one of those alleyways, the gate leading into that alley would be opened, and, it being the same length as the width of the alleys, it would be swung about so as to close the main alleyway, by latching it to the east side of the main alleyway. In that manner cattle could not proceed on southward, but would have to turn west at that point. The hinge end of the gate was the south end if the main alleyway was open at that point, and the west end if it was closed at that point.

On her left, or the east side of the alleyway, were several "chutes," where incoming cattle were customarily let out of their conveyances. Gates separated the chutes from the alleyway, so that a cow could be deposited in a chute and yet could not enter the alleyway until or unless the gate in the side of the alleyway was opened.

When plaintiff had proceeded some distance down the alleyway, the wild and vicious cow in question was let into it, behind her. Plaintiff had just passed a gate which she testified, was ajar, that is, not fastened to either of its two possible alley sides. She heard the foreman, who was in charge of unloading the cow. yell "Oklahoma" or "Oklahoma Commission Company." Knowing that the Oklahoma Commission Company pen had been to the west of that place ( though without her knowledge it had been changed the day before to the south), or in order to protect herself from the oncoming cow, she fastened the gate to the east side of the main alleyway, which placed her on the south side of the gate. so that the gate was between her and the cow. The evidence showed that it was the custom for dealers and others about the premises, whether or not employed by the defendant. to assist in opening and closing gates to facilitate the handling of cattle.

When the foreman let the beast into the main alleyway he hollered "Fire in the hole," which, according to custom, meant there was a dangerous animal in there. Plaintiff testified she did not hear this. Shortly afterward he yelled "Close the gate," which plaintiff interpreted as meaning to close the gate across the north-south alleyway as described above. The parties argue considerably over whether she fastened the gate in obedience to the foreman's order to "Close the gate" or in order to the better protect herself. We consider that question of slight importance in view of the fact that from whatever motive it was done, the fact was that there was a securely latched gate between her and the vicious animal.

A man by the name of Vic Parker, not employed by defendant, but there under much the same circumstances as plaintiff, was in the main alleyway just north of the gate. He, too, heard the foreman yell "Close the gate," but construed it oppositely to the way plaintiff had construed it. Accordingly. he unlatched the gate and kicked it in a northwesterly arc, thus closing off the opening to the west which the cow would have taken and opening the main alleyway to the south, —hastily, at the same time, climbing the fence to safety. This was, according to the foreman's testimony, exactly what he meant when he shouted to close the gate, though he intended it for one of his workmen who he thought was there.

This let the cow onto the plaintiff. The animal continued its furious charge, and though plaintiff attempted to dodge it by darting to the west side and by attempting to climb the fence, the animal was too quick for her. All of this, of course, happened in a few seconds. It struck her and knocked her down and gored a wound three inches deep in the inside of her left thigh, entirely through the muscle, and inflicted other painful injuries before she was rescued.

Defendant's first contention is that no primary negligence was shown. Defendant errs in this contention by dwelling at length on conclusions as to contributory negligence of plaintiff, as evidenced by her conduct. a subject which obviously should be treated separately. In so far as the question of primary negligence alone is concerned, defendant stresses two facts: (1) That the foreman did not see plaintiff in the alleyway when he let the animal in or when he shouted to close. the gate; and (2) that Vic Parker, who kicked the gate from between the plaintiff and the cow, was not an employee.

Those facts, under the circumstances of the case, do not negative the existence of negligence. The fact that Vic Parker was not an employee loses much of its argumentative weight when it is considered that, regardless of whether he was or was not an employee, he moved the gate directly at the instance of, and in obedience to, the command of the foreman. He so testified, and the foreman testified that such was his intention by shouting the command, though he mistakenly thought that one of his employees was at the gate. The fact remains that it was moved at the foreman's command.

As to the fact that the foreman did not

see plaintiff, there are several other matters that need be taken into consideration. Should he have seen her, or should he have taken greater precautions before turning such an animal loose into the enclosed alleyway? The uncontradicted evidence in the case answers that question. The plaintiff was there on business of her own, or of her employer, and likewise of the defendant. She was either a licensee or invitee, it is immaterial. It is conceded that she was rightly there. It was a common thing for people not connected with defendant to be there. It seems to have been the main street of the stockyard. The foreman testified that there were hundreds of people to be contended with in that alley all the time, which probably exaggerated the condition somewhat, but nevertheless it was well known to defendant that people did often pass up and down the main alleyway. It is also admitted that the foreman knew of the unusually dangerous propensities of the cow, and that she was in fact a very wild and vicious animal. He knew this before he ever turned her loose in the main alleyway. He testified that in four years' experience he had seldom seen a more dangerous one. But the fact of most importance was the custom prevailing in such a situation. The foreman testified, and so did other witnesses, some of whom were employed by defendant, that when they had a dangerous animal to deal with they always cleared the alleys first, before ever turning it loose from the chute. And prior to turning her loose, under the custom, they always had all the gates set to guide her to her destination, and after making sure that everyone was out of the alleys the man in charge would turn her loose. In view of the principle that the more dangerous an instrumentality one is handling, whether it be an animal or otherwise, the more care he should use to avoid injury to himself and others, the custom was a reasonable one, in fact, the one to be expected, and the jury was amply justified in accepting the custom as the standard of conduct consistent with reasonable care under the circumstances.

That standard was violated without question. The foreman, well knowing that he was dealing with an unusually dangerous and rampant animal, simply turned her loose in the alleyway with no more precaution than the concurrent shout of "Fire in the hole" or "Wild cow," after which he began shouting about closing the gate, which was in fact opening it on a defenseless person.

On the question of contributory negligence, even were it not for our constitutional provision making the question exclusively one for the jury, the evidence would not necessitate the finding that plaintiff was guilty thereof. Prior to the instant when the gate was unlatched and the cow let upon her, she was in a safe place. When Parker kicked the gate from between her and the animal there was a very short space of time until she was gored. Her testimony was that she ran toward the west side, expecting to evade the animal. Another witness testified that she had climbed the fence to the extent of about two boards from the bottom, when she was struck. It is also true that in that immediate vicinity there were steps which would have led her to a place of safety. She did not have the time to reason it all out that would be available to a person considering the situation after the event.

The defendant also contends that there was no causal connection between the negligence and plaintiff's injury. This contention is wholly without merit. Clearly it was the premature letting of the cow into the alleyway, fighting and charging, which led to plaintiff's injury. The defendant's argument is that it was not the letting of the cow into the alley which caused her injury, but that her injury was caused by her failure to get out of the alley in time to avoid being struck. That, to us, appears to be circuitous reasoning. Had not the cow been let into the alley there would have been no occasion for plaintiff to escape therefrom. The latter question is one of contributory negligence, as discussed above. It does not erase primary negligence nor remove the causal connection between primary negligence and the injury.

Defendant also contends that the verdict is excessive. The amount thereof was $3,500. The wound inflicted upon plaintiff, caused by the driving of a horn three inches into her left thigh, was exceedingly painful and somewhat difficult in healing. She was also injured in her knees, ankle, and elsewhere. However, the thigh wound was the most serious. It required her to be recommitted to the hospital on two different occasions, one of which confinements was of two weeks' duration. For a period of 30 days she was wholly confined and disabled, during all of which time she endured constant pain and suffering. In addition, the undisputed medical testimony established that there is probably in the neighborhood of 40 per cent. permanent disability in her left leg. Thus she is crippled for life, in addition to the

prolonged pain and suffering which the evidence shows she experienced. We are unable to say, these being the facts, that the verdict was excessive.

The judgment is affirmed.

BAYLESS, V. C. J., and RILEY, WELCH, CORN, GIBSON, and HURST, JJ., concur. OSBORN, C. J, and DAVISON, J., absent.